# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Roosevelt Wilder, Jr., | |
| Plaintiff, | Case No. 11 C 4109 |
| v. | |
| Wexford Health Sources, Inc. et al. | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

In this Section 1983 civil rights action, Plaintiff Roosevelt Wilder, Jr. claims that Defendants were deliberately indifferent in failing to provide adequate care for his hernia, pain from that hernia and post hernia surgery complications. All of the remaining Defendants filed a motion for summary judgment [124]: Dr. Parthasarathi Ghosh, Dr. Liping Zhang, Physician's Assistant LaTanya Williams, Nurse Tiffany Utke, Alan Karraker, Kevin Halloran, and Wexford Health Sources, Inc. ("Wexford"). The individual Defendants listed are or were Wexford employees. DSOF ¶ 7. As explained below, Defendants' motion for summary judgment is granted in part and denied in part.

## I.    The Evidence Before the Court

Before addressing the parties' arguments, the Court must briefly consider the state of the evidence before it. Many of the facts underpinning this Opinion come from Plaintiff's deposition and affidavit – Plaintiff's Exhibits A and B. [162-1]; [162-2]. This is because Plaintiff has provided detailed factual information regarding

specific instances of misconduct that has not, in most instances, been rebutted by the Defendants. While Plaintiff's testimony may be characterized as self-serving, that does not bar the Court's consideration. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (finding that it was error for the district court to discredit Plaintiff's testimony because it was "self-serving"); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts").

It was the Defendants' job to provide evidence contradicting Plaintiff's self-serving testimony at summary judgment. To a large extent, especially with regard to Plaintiff's specific allegations of mistreatment, they have not done so. They are left, then, to do so at trial – by challenging Plaintiff's testimony through the crucible of cross examination and the presentation of their own evidence. At this time, the Court will rely on Plaintiff's un-contradicted testimony and construe it (and all related inferences) in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[I]n doing so," however, the Court notes that it "does not vouch for [the] truth" of Plaintiff's self-serving testimony. *Pauley*, 337 F.3d at 773; *Goodhand v. United States*, 40 F.3d 209, 211 (7th Cir. 1994).

## II.    Background[1]

Plaintiff was diagnosed with a left inguinal hernia in 1996 while in the custody of the Illinois Department of Corrections ("IDOC"). [162-1] P. Ex. A at 16. This matter concerns the treatment Plaintiff received for that hernia while housed

---

[1] Where the facts have been agreed to by the parties, the background section cites to the Plaintiff's Statement of Material Facts ("PSOF") [171] or the Defendants' Statement of Material Facts ("DSOF") [125]. All other citations are to exhibits in the record.

at Stateville Correctional Center ("Stateville") from 2003 to 2011. A hernia is a protrusion of abdominal contents (intestines) through the abdominal wall and/or muscle fascia that normally contains it. [162-3] P. Ex. C at Dep Ex. 3. An inguinal hernia is a hernia that is located in the pubic region. [162-4] P. Ex. D at 17. Hernias are relatively common among men, with approximately 750,000 surgeries occurring every year in the United States. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). In general, hernias may be classified as reducible, incarcerated, or strangulated. [162-3] P. Ex. C at Dep. Ex. 3. A hernia is reducible if the herniated contents can be returned to the abdominal cavity. This is usually done manually. An incarcerated hernia is one where the herniated contents cannot be easily returned to the abdominal cavity (*i.e.*, the material "gets stuck" outside the abdominal wall). A strangulated hernia is one where the abdominal material outside of the abdominal wall gets cinched by the abdominal wall, cutting off blood flow to the herniated material. *Id.*

During most of the relevant timeframe, 2003 to 2011, Wexford was under contract to provide health care services at IDOC facilities – including Stateville.[2] Wexford had a written policy in place concerning the treatment of hernias that read:

> "Based upon the current medical literature regarding the natural history of abdominal hernias, their repair and recurrence, it is Wexford's position that: (1) Patients with stable abdominal wall hernias are not, in general, candidates for herniorrhaphy [hernia surgery] and will be monitored and treated with appropriate non-surgical therapy, (2) Patients with incarcerated or strangulated abdominal wall hernias are candidates for herniorrhaphy and

---

[2] Addus Healthcare Inc. was the vendor for IDOC health care services through 2003. Wexford has been the vendor since 2004, except for a very brief period that is not relevant to this Opinion.

will be referred urgently for surgical evaluation, and (3) Hernias which do not impact on an inmate's ADLs ["Activities of Daily Living"] in this setting would not be consideration for repair [sic]. Decisions regarding patient suitability for consideration of abdominal wall herniorrhaphy must be made on a case-by-case basis. These recommendations are intended only as a guide for the site physician and are not intended to replace hands-on clinical judgment." [162-3] P. Ex. C at 50-51, Dep. Ex. 3.

Dr. Ghosh, the medical director at Stateville, admitted that he did not "follow [that] criteria all the time." *Id*. at 51-53. Instead, Dr. Ghosh said that he relied on the judgment of the physician, and that surgery should be performed if: (1) the hernia is getting bigger; (2) constant pain is present or ADL's are affected; or (3) difficulty reducing the hernia exists. *Id*. at 26, 51-53.

From 1996 to 2003, Plaintiff's hernia would pop out occasionally, but it was easily reducible. [162-1] P. Ex. A at 21-22. It only hurt when it popped out and while he was reducing it. *Id*. Plaintiff's complaint is not based on the treatment of his hernia between 1996 and June 2003. [162] P. Resp. at 2.

On July 11, 2003, Plaintiff aggravated his hernia while climbing his bunk bed. [162-1] P. Ex. A at 24. Dr. Tielden, who is not a party here, evaluated Plaintiff and found a left inguinal hernia approximately two centimeters in size. [162-3] P. Ex. C at 21-22. On August 21, 2003, Plaintiff wrote Dr. Ghosh saying that his hernia caused "constant pain and discomfort" and limited his ADL's. PSOF ¶ 66. Plaintiff further said, "I pray that you do something about this hernia, <u>soon</u>. I'm in constant pain and discomfort. My ability to exercise has been severely curtailed, and I'm always wondering if this hernia with obstruct, strangulate or rupture – and

kill me." [162-3] P. Ex. C at Dep. Ex. 5 (emphasis in original). Dr. Ghosh did not recall receiving that letter. [162-3] P. Ex. C at 59.

On September 7, 2003, Plaintiff filed a grievance urgently requesting hernia surgery. [162-3] P. Ex. C at Dep. Ex. 7. Plaintiff wrote: "due to intense pain from my hernia I fell while attempting to jump into the top bunk. The fall further aggravated the injury and the constant pain and discomfort intensified." *Id*. On September 17, 2003, Dr. Ghosh examined Plaintiff and recommended an onsite surgical consultation by a specialist, Dr. R.K. Natesh. DSOF ¶ 23-25. Dr. Ghosh found that the hernia was not strangulated or incarcerated, and that it was reducible. [162-3] P. Ex. C at Dep. Ex. 2. He further found that the hernia was not painful to reduce. *Id*. at 33.

Dr. Natesh examined Plaintiff on September 24, 2003. [162-2] P. Ex. B at ¶ 9. After that visit, Plaintiff told Dr. Ghosh that "Dr. Natesh recommended surgery," yet Dr. Ghosh did not approve surgery. [162-1] P. Ex. A at 69:5-15; [162-2] P. Ex. B at ¶ 9. Dr. Ghosh told Plaintiff that just because surgery is recommended does not mean he has to approve it. [162-1] P. Ex. A at 69. Dr. Ghosh does not remember Dr. Natesh's recommendation, [162-3] P. Ex. C at 37, and there is no copy of that recommendation in the record. At some point, Dr. Ghosh explained to Plaintiff that if the hernia "wasn't incarcerated or strangulated, it wasn't life-threatening, so it wasn't an emergency" and did not require surgery. [162-1] P. Ex. A at 70. He said as long as Plaintiff could reduce the hernia, no matter how painful, Plaintiff was not

a candidate for surgery. *Id*. at 70-71. It is unclear from the record when exactly Dr. Ghosh conveyed that information.

On June 3, 2004, Plaintiff received a response to his 9/7/03 grievance. [162-3] P. Ex. C at Dep. Ex. 7-8. The response denied Plaintiff's request for hernia surgery, stating that Dr. Ghosh reviewed Plaintiff's chart and, per the evaluation done by the "MD's there is not evidence of any medical emergency of immediate surgery." *Id*. Plaintiff therefore did not undergo hernia surgery at that time. [162-1] P. Ex. A at 27:10-14.

Between September 2003 and December 2009 (the date of Plaintiff's eventual surgery), Plaintiff alleged he was in continuous pain. [162-1] P. Ex. A at 28. Whenever he coughed, sneezed, raised his voice or defecated his hernia would extrude and he would be in pain until he could reduce it. *Id*. at 29. Plaintiff testified that he lived in a "world of pain" for those six years and was not given any pain medication. *Id*. He further stated that he frequently complained of his pain and requested surgery from Dr. Ghosh and others in the health care unit. *Id*. at 29-31.

During that same period, 2003 to 2009, Plaintiff worked as a barber and in the soap factory at Stateville. *Id*. at 10-12. He explained that he was physically able to do those jobs because he was given "light duty," which did not require heavy lifting. *Id*. at 9-10. From 2004 to 2008, Plaintiff did not file any formal grievances about his hernia treatment. *See* [9] Complaint.

On February 16, 2007, Plaintiff complained to Physicians Assistant LaTanya Williams ("Williams") of his persistent pain. [162-2] P. Ex. B at ¶11. Likewise, on August 30, 2008, Plaintiff complained to Dr. Zhang of his persistent pain. *Id*. On January 7, 2009, Plaintiff wrote letters to Williams, Dr. Ghosh and Dr. Zhang describing his pain and seeking relief. *Id*. at ¶12.

The specifics of Plaintiff's June 16, 2009 interaction with Dr. Zhang are disputed. According to Plaintiff, he saw Dr. Zhang on that day and she refused to address his pain or recommend referral to a surgeon or specialist. *Id*. at ¶17. Instead, she told Plaintiff to lose weight to eliminate the pain. Plaintiff testified that she said, "everybody ha[s] pain. Everybody, all the time, people are in pain. You're a big boy. For you, a little pain is nothing. You'll be alright." *Id*. In her affidavit, Dr. Zhang disagreed. She said that "while a hernia was noted, there was no pain and it was easily reducible." [162-8] P. Ex. H. Dr. Zhang declined to recommend surgery. [162-2] P. Ex. B at ¶17.

On February 19, 2009, Plaintiff sent a letter to Alan Karraker, the regional administrator for Wexford, asking that Wexford authorize surgery. *Id*. at ¶ 13. Karraker did not respond and presently does not recall receiving the letter. [162-5] P. Ex. E. Plaintiff wrote similar letters on June 25, 2009 and July 7, 2009 to both Karraker and Kevin Halloran (CEO of Wexford). [162-2] P. Ex. B at ¶17. Neither took any action in response and neither remembers receiving the letter. [162-5] P. Ex. E; [162-6] P. Ex. F. Karraker and Halloran have no medical training and are not responsible for medical oversight at Wexford. *Id*. Karraker was in charge of

human resources, the State of Illinois contract, and personnel union issues. *Id*. Halloran was the Chairman of Wexford. *Id*. Moreover, inmate letters sent to Wexford's corporate office are routed to Joseph Ebbitt, the Director of Risk Management and Legal Affairs, regardless of who the letter was intended for. *Id*.

Plaintiff was examined by Williams on February 25, 2009, but there is a dispute in the record as to what happened during that examination. Plaintiff says that he complained to Williams about constant pain from his hernia. [162-2] P. Ex. B at ¶14. Those complaints were listed in his medical log. [162-5] P. Ex. D at 11-12. According to Plaintiff, Williams examined his hernia and caused him to yell out in pain more than once, but refused to treat Plaintiff's pain or refer him to a surgeon or specialist for evaluation. [162-2] P. Ex. B at ¶14. As Plaintiff retells, she said "I'm not going to bullshit you. The truth is we do nothing for inmates with hernias, unless the hernia becomes incarcerated or strangulated." *Id*. Williams testified, however, that though Plaintiff had complained of pain, she had written in Plaintiff's medical log that – based on her examination – Plaintiff's hernia was "non-tender or no tenderness." [162-5] P. Ex. D at 14.

On July 9, 2009, Dr. Ghosh examined Plaintiff and saw that the hernia had grown to 4 centimeters in size. [162-4] P. Ex. C at 44. Plaintiff reported constant pain and the hernia extruding when he sneezed, coughed, talked loudly or defecated. [162-1] P. Ex. A at 37-39. Dr. Ghosh referred Plaintiff to the University of Illinois Chicago ("UIC") hospital for a second consultation. [162-4] P. Ex. C at 44. Plaintiff was seen on August 14, 2009 at UIC and surgery was recommended.

Plaintiff underwent hernia surgery on December 29, 2009. [162-1] P. Ex. A at 40-41. The surgery was not done on an emergency basis, and the hernia was neither strangulated nor incarcerated. *Id*. at 71.

After surgery, Plaintiff spent one day in the infirmary before being sent back to his cell. *Id*. at 42. While in the infirmary, Plaintiff received pain medications prescribed by his surgeons at UIC. *Id*. Once back in his cell, the Wexford staff discontinued his pain medications even though Plaintiff was in "intense pain." *Id*. at 43-44. On January 1, 2010, Plaintiff went to the health care unit seeking pain medication and was seen by Nurse Tiffany Utke. [162-2] P. Ex. B at ¶ 31. She said: "[y]ou can't have the pain medication that has been prescribed for you while you are in population; you have to be in the infirmary to receive this." *Id*. Plaintiff said he didn't necessarily need Tylenol or Vicodin, but would take anything for pain. *Id*. He still got nothing. *Id*. Plaintiff asked to remain in the infirmary so that he could receive medication for his "intense pain," but this request was denied. [162-1] P. Ex. A at 44. Nurse Utke only gave the Plaintiff a stool softener (Colace), [162-7] P. Ex. G, and refused to provide even the Tylenol Dr. Ghosh had prescribed. [162-1] P. Ex. A at 45; [162-3] P. Ex. C at 48.

Following surgery, Plaintiff's navel incision from the surgery became an infected, open sore with continual pain that was not properly addressed for several months. [162-1] P. Ex. A at 46-47. On January 28, 2010, Plaintiff filed a grievance regarding his infected wound. [162-2] P. Ex. B at ¶ 42. Dr. Ghosh responded by saying "all medical issues have been addressed and treated appropriately." *Id*. at ¶

43.  As set out in Plaintiff's affidavit, Dr. Ghosh ignored all of Plaintiff's verbal requests, sick call request slips, and personal letters about his post-surgery complications from the end of January 2010 to the beginning of April 2010.  This was true even though, on at least one occasion, Plaintiff had a suture that forced its way through his navel incision (from the inside out) and contributed to his bloody, open wound.  *Id*. at ¶ 41.

On April 7, 2010, Plaintiff was examined again by Williams – who scheduled an emergency room visit regarding Plaintiff's infected, open wound on the following day.  [162-2] P. Ex. B at ¶ 45.  On April 8, Plaintiff came to the health care unit but Williams and Dr. Ghosh disagreed about who had to treat him.  *Id*. at ¶ 46.  Eventually, they both refused.  *Id*.  During that visit, Williams angrily told the Plaintiff: "You are [Dr. Ghosh's] responsibility, not mine! This is his screw-up, not mine! I identified the emergency and I got you up here to see Dr. Ghosh, like I said I would.  How did this come back to me? How did you become my responsibility? I'm not touching this. Because if you decide to file some paperwork on this I don't want my name anywhere near it. This is his responsibility, not mine!"  *Id*.  Williams then walked away and the appointment was rescheduled to April 9, 2010.  *Id*.  The record does not show what treatment Plaintiff received at the April 9 appointment.

On May 21, 2010, Plaintiff was given ointment and gauze by Williams, which did not help to close the wound.  *Id*. at ¶ 56-57.  Right before Plaintiff left that appointment, Williams said "I'm ordering some more ointment just for you, Mr. Wilder, because I know you'll call home crying to your mommy that I'm not taking

care of you." *Id*. She then made whining noises, mimicking the crying sounds of a baby. *Id*. at ¶ 57.

Plaintiff was sent to the UIC on June 16, 2010 (six months after his original surgery) for a procedure to correct his wound and infection. *Id*. at ¶ 58. That surgery did not fully resolve Plaintiff's problem, as Plaintiff's sore remained painful and, at times, open. *Id*. at 59-63. On November 11, 2010, a suture again poked through Plaintiff's open wound. *Id*. at 69. This suture was 2 inches long and Plaintiff had to remove it himself. *Id*. On November 17, 2010, Plaintiff spoke with Williams about the wound, which was still discharging pus. *Id*. at ¶ 72. Williams said, "I'm not touching that. I already told you I'm not dealing with Dr. Ghosh's fuck up, because when you file your lawsuit I don't want to have anything to do with it. You'll have to see Dr. Ghosh about that." *Id*. Plaintiff asked for antibiotics but Williams directed him to Dr. Ghosh. *Id*. at ¶ 72. It is unclear whether Plaintiff ultimately received antibiotics.

Plaintiff requested medical attention on numerous other occasions between June and December 2010, and was often denied care. *Id*. at ¶¶ 8-9, 59-61. This included alerting medical personnel to his needs on August 27, August 31, and September 10, 2010. *Id*. at ¶59-61. Specifically, on September 10, 2010, Plaintiff was called to the health care unit where Nurse Utke screamed at him, "[i]f you don't stop bitching about your little 'wound' you're going to lose your job." *Id*. at ¶ 62. On March 15, 2011, fifteen months after Plaintiff's original hernia surgery, a second

surgery was performed on Plaintiff's wound and it was closed successfully. [162-1]
P. Ex. A at 48, 53.

## III.  Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," and the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Liberty Lobby*, 477 U.S. at 255; *see also Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## IV.  Analysis

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (internal citations and quotations omitted). Prison officials violate the Constitution if they "are deliberately indifferent to prisoners' serious medical needs." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A claim for deliberate indifference must show: (1) an objectively serious medical condition; and (2) an

official's deliberate indifference to that condition. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

### a. Objectively Serious Medical Condition

There are two medical conditions at issue here: (1) the Plaintiff's hernia, and (2) the painful open wound that resulted from his hernia surgery. With regard to Plaintiff's hernia, the parties agree that it was an objectively serious medical condition. [162] D. MSJ. at 2. As for the wound, the Court finds that it was also an objectively serious medical condition. A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). Courts in this Circuit have found the following medical conditions objectively serious: an untreated and infected cyst that resulted in the infliction of unnecessary pain, *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); minor burns, *O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006); and tooth decay. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)

Here, plaintiff's surgeon accessed his hernia by creating an incision near his belly button. After surgery, the incision became an open wound that suffered from: infections, ongoing pain, and sutures poking out of the wound from the inside. The wound remained open to varying degrees for approximately fifteen months, ultimately requiring two additional surgeries to close successfully. That condition is sufficiently serious to proceed under section 1983.

### b. Deliberate Indifference

"Deliberate indifference is a subjective standard." *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006). To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. *Id*. A prison official satisfies that standard if "he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett*, 658 F.3d at 751.

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). This has been found to include instances where medical professionals: delayed in treating pain from an objectively serious medical condition, *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008); refused to follow the advice of a specialist, *Gil v. Reed*, 381 F.3d 649, 663-63 (7th Cir. 2004); or failed to treat pain at a nominal cost. *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).

### c. Hernia Case Law in the Seventh Circuit

Two cases from this Circuit are directly relevant here, and merit in depth consideration. In *Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011), the Seventh Circuit found that the inmate had stated a claim of deliberate indifference regarding hernia treatment that was sufficient to survive a motion to dismiss. The facts in that matter were very similar to the facts here. In *Gonzalez*, the inmate

developed a hernia in 2004, and complained regularly as his pain increased over the next six years. *Id.* at 313. In 2009, he saw the defendant doctor and requested surgery. *Id.* The doctor declined the request, stating that he would be fine as long as the hernia could recede into his abdomen. *Id.* Yet from April until December 2010, the hernia was consistently visible and caused abdominal pain. *Id.* Defendants nonetheless persisted in denying surgery for the inmate up through the time he filed the complaint. *Id.*

In his complaint, the inmate claimed that the prison physicians had been deliberately indifferent in refusing to authorize surgery for his hernia even though it was getting worse and causing constant pain. *Id.* The court explained that the inmate could prevail if "defendants' response to more than two years of complaints has been blatantly inappropriate in the face of his pain and the risk the worsening hernia poses to his present and future health." *Id.* at 314. It further noted that, "[d]elay in treating a condition that is painful even if not life-threatening may well constitute deliberate indifference." *Id.* at 315. Given the fact that the inmate's hernia had "continued to worsen, was constantly protruding, and was causing extreme pain," the Court found that "a reasonable factfinder could infer that [the prison physicians] substantially departed from professional judgment by refusing to authorize surgical repair for [the inmate's] painful hernia." *Id.* at 314.

The Court in *Heard v. Illinois Department of Corrections*, No. 06 C 644, 2012 WL 832566, at *7 (N.D. Ill. Mar. 12, 2012), reached a similar conclusion at summary judgment. There, the inmate was diagnosed with a single hernia in 1995,

and a double hernia in 2000. *Id.* at *2. In 1996, an IDOC doctor recommended surgical repair for the inamte's hernia, but that surgery never took place. *Id.* In 2000, the inmate again requested surgery but was denied. While IDOC doctors noted in their records that the inmate claimed the hernias were painful, the parties disputed whether he ever complained of that pain when he visited Dr. Ghosh. *Id.* The inmate claimed that he complained of pain at all his doctor visits and that the hernia pain made him less active and affected his mobility. *Id.*

Over the next several years, the inmate repeatedly complained of pain and requested surgery. *Id.* at *2-3. Those requests were denied by Dr. Ghosh, one of the defendants here, even though he knew the inmate had complained of increased pain. *Id.* The IDOC similarly denied several grievances related to the pain from the inmate's hernia. On May 22, 2007, the inmate's hernia became incarcerated, he was taken to the emergency room, and he underwent surgery. *Id.*

In *Heard*, Dr. Ghosh argued, as here, that he treated the hernia properly, albeit conservatively, and that the inmate's challenge was nothing more than a disagreement with Dr. Ghosh's medical judgment. *Id.* at *6. The court, relying on *Gonzalez*, 663 F.3d at 311, disagreed. It concluded that the inmate had presented facts sufficient for a reasonable jury to infer deliberate indifference even though the parties disputed the severity and frequency of the inmate's pain. *Id.* It found that the inmate's hernia was not repaired for thirteen years after it was diagnosed, and that he had produced evidence showing he suffered significant pain. *Id.* Further, the court emphasized that Dr. Ghosh had repeatedly refused surgery even though it

had been recommended by a specialist. *Id.* at *7. The court thus denied the defendants' motion for summary judgment and allowed the case to proceed to trial. Both *Heard* and *Gonzalez* are directly relevant here. This Court will address each Defendant separately below.

### d. Dr. Ghosh

Defendants' motion for summary judgment is denied with regard to Dr. Ghosh. Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could find in his favor. This is true for two reasons: (1) Dr. Ghosh refused to allow surgery in 2003, and (2) Dr. Ghosh ignored Plaintiff's repeated complaints of pain and requests for treatment from 2003 to 2011.

In light of the decisions in *Heard* and *Gonzalez*, a reasonable jury could find that Dr. Ghosh's failure to authorize surgery in 2003 – despite his knowledge of Plaintiff's pain, the limitations to Plaintiff's ADLs, and Dr. Natesh's recommendation – constitutes deliberate indifference. In *Heard*, the court found that Dr. Ghosh was not entitled to summary judgment because he refused to allow hernia surgery despite his knowledge of plaintiff's significant pain and the specialist's recommendation. *Heard*, 2012 WL 832566. In *Gonzalez*, the court noted that "[d]elay in treating a condition that is painful even if not life-threatening may well constitute deliberate indifference," and found that failure to approve surgery could be deliberate indifference where plaintiff's hernia "continued to worsen, was constantly protruding, and was causing extreme pain." 663 F.3d at 313-315. Those two cases are directly on point here.

Dr. Ghosh's decision not to allow surgery directly contravened his own stated criteria for hernia surgery and the holdings in *Heard*, *Gonzalez* and several other cases from this circuit. *See Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004); *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). He also made the decision despite being aware of Dr. Natesh's recommendation in favor of surgery. On September 24, 2003, Plaintiff visited Dr. Natesh for a surgical evaluation. Plaintiff told Dr. Ghosh that "Dr. Natesh recommended surgery," but Dr. Ghosh denied that recommendation. [162-1] P. Ex. A at 26:8-17, 69:5-15; [162-2] P. Ex. B at ¶ 9. He explained that if the hernia "wasn't incarcerated or strangulated, it wasn't life-threatening, so it wasn't an emergency" and didn't require surgery. *Id.* at 70. He said as long as Plaintiff could reduce the hernia, no matter how painful, Plaintiff was not a candidate for surgery. *Id.* at 70-71. Dr. Ghosh made the decision to deny surgery despite Plaintiff having told him multiple times that the hernia caused him "constant pain and discomfort" and limited his ADL's. PSOF ¶ 66.

Defendant incorrectly argues that Plaintiff's testimony that he told Dr. Ghosh about Dr. Natesh's recommendation is hearsay and should not be considered at summary judgment. [175] D. Reply at 3-4. Here, Plaintiff testified that he told Dr. Ghosh that "Dr. Natesh recommended surgery." [162-1] P. Ex. A at 69:5-15. That statement is not hearsay, as Plaintiff will presumably give that testimony at trial and the Defendants will be able to challenge it through cross examination. Further, the statement imbedded within Plaintiff's testimony, that Dr. Natesh recommended surgery, is not being offered for its truth (*i.e.*, to prove that surgery

was required), but to show that Dr. Ghosh had *knowledge* of Plaintiff's injury and the substantial risk of harm that injury posed. That statement is therefore not hearsay. *Venture Associates Corp. v. Zenith Data Sys. Corp.*, No. 92 C 978, 1995 WL 151850, at *2 (N.D. Ill. Apr. 3, 1995) (finding that a statement was not hearsay where it was not offered for the truth of the matter asserted but to show defendant's knowledge or state of mind).

Deliberate difference is a "subjective standard" under which the Plaintiff must show that the Defendant "knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett,* 658 F.3d at 751. Here, Plaintiff's testimony regarding Dr. Natesh's recommendation is being used by the Court to determine what Dr. Ghosh *knew* about the Plaintiff – *i.e.*, Dr. Ghosh *knew* that a specialist had recommended surgery. This, combined with the fact that Dr. Ghosh *knew* that Plaintiff was in constant pain, and *knew* that Plaintiff's ADLs were limited, is sufficient to allow a reasonable jury to conclude that Dr. Ghosh was deliberately indifferent to Plaintiff's medical condition.

Even if the Court excluded Plaintiff's statements regarding Dr. Natesh's recommendation it still would deny the motion for summary judgment with regard to Dr. Ghosh. The record shows a long history of complaints from the Plaintiff to Dr. Ghosh regarding the pain from his hernia and the effect it had on his ADLs. Despite this, Dr. Ghosh did not provide pain medication or allow surgery for a number of years. The delay in treatment of a painful problem, though not life

threatening, can constitute deliberate indifference. *Gonzalez*, 663 F.3d at 315. Here, a reasonable jury could find that it was.

Defendants argue that Dr. Ghosh is entitled to summary judgment because the dispute here is nothing more than a difference of opinion over the proper course of treatment, which does not constitute deliberate indifference. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). However, Dr. Ghosh himself said that surgery should be performed if constant pain is present or ADL's are affected. [162-3] P. Ex. C at 26. This is not, then, a difference of opinion regarding treatment. Here, the evidence in the record, construed in the light most favorable to the Plaintiff, indicates Dr. Ghosh knew that the Plaintiff was in constant pain due to his hernia and his ADL's were limited. Under Dr. Ghosh's own requirements, and the evidence in the record, a reasonable jury could find deliberate indifference.

### e. LaTanya Williams

With regard to Williams, Defendants' motion for summary judgment is denied because: (1) there is a dispute of material fact with regard to the February 25, 2009 encounter, and (2) a reasonable jury could find that Williams was deliberately indifferent to Plaintiff's medical needs.

There is a dispute over whether Plaintiff was in pain at the time of the February 25, 2009 examination. On that day, Plaintiff complained to Williams about constant pain from his hernia. Those complaints were listed in his medical log. According to Plaintiff, Williams examined him, caused him to yell out in pain

more than once, and refused to treat his pain. [162-2] P. Ex. B at ¶ 14. She said, "I'm not going to bullshit you. The truth is we do nothing for inmates with hernias, unless the hernia becomes incarcerated or strangulated." *Id*. Williams testified, however, that though Plaintiff had complained of pain, based on her examination the hernia was "non-tender or no tenderness." [162-4] P. Ex. D at 14. This was also noted in Plaintiff's medical log. *Id*. This fact is material because knowledge of and failure to treat pain could signal deliberate indifference. *See Gil*, 381 F.3d at 661-62; *Ralston*, 167 F.3d 1160.

Apart from this factual dispute, summary judgment also is denied because Williams repeatedly ignored Plaintiff's complaints regarding his hernia pain, and did so in a way that was taunting and dismissive. A medical professional's delay in treating pain, or response to pain complaints that is plainly inappropriate, permit the inference of deliberate indifference. *Grieveson*, 538 F.3d at 778; *Berry*, 604 F.3d at 441. *Gonzalez* is also instructive. 663 F.3d 311 (7th Cir. 2011). The court in *Gonzalez* found that chronic pain from a hernia was an objectively serious condition and that defendants gave the inmate minimal or no medication for his ongoing pain, which was so bad it limited his ADLs. *Id*. at 314. That refusal to provide medication, in addition to defendants' refusal to allow surgery, was sufficient to present a plausible claim that the inmate's doctors were deliberately indifferent. *Id*. at 314-15.

The same is true here. Under Plaintiff's narration of the events, he repeatedly complained to Williams about the pain associated with his hernia but

Williams did not provide pain medication or take any other steps to insure that Plaintiff's hernia was appropriately treated. [162-2] P. Ex. B at ¶ 11-12. In fact, Williams distanced herself from Plaintiff's medical care altogether.

Following Plaintiff's surgery, he complained to Williams on a number of occasions about the open sore that resulted from surgery and the corresponding severe pain. Williams not only refused to provide adequate treatment, but she did so with a disdain suggesting malice. *See Gil*, 381 F.3d at 660 (7th Cir. 2004) (angry tone of defendant in refusing to treat plaintiff's pain could indicate that there was no legitimate reason for the refusal – and that defendant may have been motivated by malice).

On April 8, 2010, when Plaintiff came to the Emergency Room for treatment of his open infected wound, Williams and Dr. Ghosh argued about who had the responsibility to treat the Plaintiff. According to Plaintiff, Williams angrily told him: "You are his responsibility, not mine! This is his screw-up, not mine! I identified the emergency and I got you up here to see Dr. Ghosh, like I said I would. How did this come back to me? How did you become my responsibility? I'm not touching this. Because if you decide to file some paperwork on this I don't want my name anywhere near it. This is his responsibility, not mine!" [162-2] P. Ex. B at ¶ 46.

Then, on May 21, 2010, Williams told the Plaintiff she had "ordered some more ointment just for you, Mr. Wilder, because I know you'll call home crying to your mommy that I'm not taking care of you." She then made whining sounds,

mimicking the crying sounds of a baby. *Id.* at ¶ 57. Finally, on November 17, 2010, Plaintiff spoke with Williams about the wound, which was still discharging pus. Williams said, "I'm not touching that. I already told you I'm not dealing with Dr. Ghosh's fuck up, because when you file your lawsuit I don't want to have anything to do with it. You'll have to see Dr. Ghosh about that." Plaintiff asked for antibiotics but Williams directed him to Dr. Ghosh. *Id.* at ¶ 69, 72.

This refusal to provide care, along with Williams' taunting and disdainful comments to the Plaintiff, is sufficient to allow a reasonable jury to conclude that Williams was deliberately indifferent to Plaintiff's medical needs. *See Gil*, 381 F.3d at 660; *Ralston*, 167 F.3d 1160 (failure to provide an inexpensive or conventional treatment for pain precluded judgment for defendants on claim for deliberate indifference).

### f. Dr. Zhang

Defendants' motion for summary judgment is denied with regard to Dr. Zhang because there is a genuine issue of material fact regarding whether Dr. Zhang was aware of Plaintiff's hernia pain. According to her affidavit, when Dr. Zhang treated Plaintiff on June 16, 2009, his hernia was not in pain. [162-6] P. Ex. F. Plaintiff, however, testified differently. He provided a signed affidavit stating that he was seen by Dr. Zhang on June 16, 2009 and that she refused to address his pain or recommend referral to a surgeon/specialist. [162-2] P. Ex. B at ¶ 17. Instead, she told the Plaintiff to lose weight, saying "everybody ha[s] pain. Everybody, all the time, people are in pain. You're a big boy. For you, a little pain

is nothing. You'll be alright." *Id*. at ¶17. This issue of fact is material because whether Dr. Zhang could be found deliberately indifferent depends on her knowledge of Plaintiff's pain. *See Gil*, 381 F.3d at 660. Here, that knowledge is disputed, and therefore summary judgment is inappropriate.

### g. Tiffany Utke

Nurse Tiffany Utke is not entitled to summary judgment because the record shows she refused to provide care for Plaintiff's post-surgery wound and, in doing so, made statements to the Plaintiff that would allow a reasonable jury to find she acted with deliberate indifference.

As with Williams, Utke's angry tone in refusing to treat Plaintiff's pain could indicate that there was no reason for the refusal of medical care apart from malice. *Gil v. Reed*, 381 F.3d 649, 660 (7th Cir. 2004). On two different occasions, Utke refused to provide Plaintiff with pain medication. While it is unclear from the record whether she did so because of some prison policy limiting the provision of medication; Plaintiff has alleged – and Utke has not rebutted – that she made several demeaning comments to the Plaintiff in the course of denying him treatment.

On September 10, 2010, Plaintiff was called to the health care unit where nurse Utke screamed at him: "If you don't stop bitching about your little 'wound' [said sarcastically] you're going to lose your job." *Id*. at ¶ 62. Then, on or about September 17, 2010, Utke came to Plaintiff's cell to give him a Tuberculosis test. While there, she sarcastically asked him, "how is your belly-button?" Plaintiff

replied, "the same, why, am I scheduled to go back to the surgeon?" Utke laughed, saying, "no, no, no I just want to know how your little 'wound' is doing now that you know you're going to lose your job." *Id*. at 63. She then laughed and walked away. *Id*. The Court finds that Nurse Utke's taunting and demeaning comments towards the Plaintiff, along with her failure to appropriately respond to his complaints of pain, are sufficient to allow a reasonable jury to conclude that she was deliberately indifferent.

### h. Wexford Health Sources, Inc.

The Defendants' motion for summary judgment is denied with regard to Wexford. A corporate entity[3] violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). The Plaintiff may prevail on this point by showing "an express policy which caused the injury, a widespread practice that is so well-settled as to amount to a policy, or that [Wexford] had the final policymaking authority for the decisions regarding the medical treatment [Plaintiff] received." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002).

*Heard* is particularly instructive here. 2012 WL 832566. In fact, the policy at issue here is the exact same policy discussed in *Heard*.[4] There, the Court said that Wexford could be held liable under 1983 if it "maintained a policy or a custom

---

[3] Section 1983 liability applies to corporations that are under contract to provide jail medical services. *Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010).

[4] *Heard v. Illinois Dep't of Corr.*, No. 06-cv-644, at Dkt. 302-5 (N.D. Ill.).

that violated Heard's rights." *Id*. at *7. It found that Wexford was not entitled to summary judgment for two reasons: (1) because Heard had "presented sufficient evidence that Ghosh was following Wexford's policy when he chose to go against the surgeons' recommendation and not authorize surgery," and (2) because a reasonable jury could find that Wexford's "hernia policy was unconstitutional as to patients with hernias that are not strangulated or incarcerated because it does not account for pain caused by the hernia." *Id*. at 8.

This Court sees no reason to depart from *Heard*. Here, the repeated comments by Dr. Ghosh and Williams regarding the reasons Plaintiff would not receive surgery are sufficient to allow a reasonable factfinder to conclude that Plaintiff was not given surgery due to Wexford's policy. For instance, Dr. Ghosh said that if the hernia "wasn't incarcerated or strangulated, it wasn't life-threatening, so it wasn't an emergency" and did not require surgery. [162-1] P. Ex. A at 70. He said as long as Plaintiff could reduce the hernia, no matter how painful, Plaintiff was not a candidate for surgery. *Id*. at 70-71. Williams echoed those sentiments, saying "I'm not going to bullshit you. The truth is we do nothing for inmates with hernias, unless the hernia becomes incarcerated or strangulated." [162-2] P. Ex. B at ¶ 14. While surgery was eventually allowed without incarceration or strangulation, for years it was denied under Wexford's policy

*because* it was not incarcerated or strangulated. Under the reasoning in *Heard*, this is sufficient to allow a claim to proceed against Wexford.[5]

*Heard* also supports denying Wexford's motion for summary judgment in a second way: Wexford's policy did not provide for the consideration of Plaintiff's pain level. In its conclusion, the *Heard* court noted that,

> "Wexford's policy simply does not consider the patient's level of pain as a factor in whether or not the patient should have surgical repair of his hernias. Indeed, the policy does not mention pain at all. Consequently, as written, the policy counsels against routine surgery for hernias that are very painful but not strangulated or incarcerated. Given that Heard has demonstrated that a patient could endure years of intermittent hernia pain before the hernia becomes strangulated or incarcerated, a reasonable jury could find that the policy is unconstitutional for patients like Heard with painful though reducible hernias." *Heard v. Illinois Dep't of Corr.*, No. 06 C 644, 2012 WL 832566, at *8 (N.D. Ill. Mar. 12, 2012).

This Court agrees with the analysis in *Heard*. The Wexford policy regarding hernias makes no allowance for the inmate's pain, even though its own medical director Dr. Ghosh said that he would order surgery based on that pain. While the policy affords some medical discretion, a reasonable jury could find that the failure to include any instruction regarding an inmate's pain resulted in deliberate indifference here.

### i. Kevin Halloran and Alan Karraker

With regard to Defendants Halloran and Karraker, the motion for summary judgment is granted. Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual

---

[5] The Court is aware that, during the year 2003, Addus was under contract to provide medical services and thus the decisions made during that year would have been pursuant to Addus' policy. However, there is sufficient evidence that, between 2004 and 2009, the Plaintiff was denied surgery based on Wexford's policy.

defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005). For supervisors like Halloran and Karraker, this means that they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

The basis for that rule is that supervisors "do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

Halloran and Karraker are entitled to judgment because they did not know about, approve, condone, or turn a blind eye towards any of the misconduct here. Plaintiff argues that summary judgment should be denied with regard to Halloran and Karraker because he "sent written grievances to Alan Karraker and/or Kevin Halloran in Feb., June and Dec. 2009 but did not receive any response to his requests for surgery or medical treatment." [162] P. Resp. at 18. Therefore, argues the Plaintiff, a reasonable jury could conclude that they could have ordered surgery or at least had the responsible parties review Plaintiff's condition. This argument,

however, ignores the Wexford administrators' lack of knowledge about Plaintiff's complaints, their role in the Wexford hierarchy, and the procedure that Wexford had in place for handling inmate letters.

First, there is no evidence showing that either administrator knew about Plaintiff's complaint. Karraker does not remember receiving any letters from Plaintiff, and Joe Ebbitt – the Wexford Director of Risk Management and Legal Affairs – stated that any letters from Plaintiff would have been delivered to him, not Halloran or Karraker. [162-5] P. Ex. E; [162-6] P. Ex. F. Second, there is no evidence that either Halloran or Karraker approved or condoned the misconduct alleged by Plaintiff. In fact, neither administrator had the power to do so. Halloran did not "have responsibility for making or implementing medical polices or procedures," and Karraker's job responsibilities did not "include medical treatment of inmates or the oversight of medical treatment provided by medical/clinical staff." *Id*. Third, the administrators did not turn a blind eye to Plaintiff's complaints. There was a system in place within Wexford to ensure that inmate letters sent to administrators were directed to the Wexford Director of Risk Management and Legal compliance, so that they could be dealt with appropriately. *Id*. As explained in *Burks*, these administrators cannot be held liable simply because Plaintiff sent them a letter. There was a system set up within Wexford to receive inmate letters and delegate responsibility for them to Joe Ebbitt and others at Wexford Corporate. This Court will not hold Halloran and Karraker liable for failing to act as ombudsmen.

The Court is aware of several cases in this district where similar claims against Halloran and Karraker were allowed to proceed past the motion to dismiss stage – a different procedural posture than here. *See Young v. Wexford Health Sources*, No. 10 C 8220, 2012 WL 621358 (N.D. Ill. Feb. 14, 2012); *Reliford v. Ghosh*, No. 10 C 3555, 2011 WL 3704747 (N.D. Ill. Aug. 19, 2011); *Thomas v. Ghosh*, No. 08 C 4644, 2009 WL 910183 (N.D. Ill. Mar. 31, 2009). Each of those cases survived the motion to dismiss stage primarily because each court rightly accepted the plaintiffs' allegations as true. The courts explained, however, that their decision might change if – at summary judgment – the defendants could present evidence showing that they did not receive the letters, had no oversight regarding treatment decisions, and had implemented a system at Wexford such that the letters were not ignored. *Young*, 2012 WL 621358, at *7; *Reliford*, 2011 WL 3704747, at *4; *Thomas*, 2009 WL 910183, at *5. Defendants have presented just such evidence here.

## V.    Conclusion

In light of the foregoing, Defendants' motion for summary judgment [124] is granted with respect to Alan Karraker and Kevin Halloran. It is denied with respect to Dr. Ghosh, Dr. Zhang, LaTanya Williams, Tiffany Utke, and Wexford.

IT IS SO ORDERED

Dated: May 8, 2015                                    Entered:

                                                     _____
                                                     John Robert Blakey
                                                     United States District Judge